# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRIAN J. LYNGAAS, D.D.S., P.L.L.C.** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 20-2370** |
| v. | : | |
| | : | |
| **IQVIA, INC.** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                                     JULY 9, 2024

## MEMORANDUM OPINION

**INTRODUCTION**

Plaintiff Brian J. Lyngaas, D.D.S., P.L.L.C. ("Plaintiff") filed this class action against Defendant IQVIA, Inc. ("Defendant"), asserting that Defendant violated the Telephone Consumer Protection Act (the "TCPA"), 47 U.S.C. § 227(b)(1)(C), when sending Plaintiff and other purportedly similarly situated healthcare provider class members unsolicited fax advertisements without prior express invitation or permission. (ECF 1).

Before this Court is Plaintiff's motion for class certification filed pursuant to Federal Rule of Civil Procedure ("Rule") 23, (ECF 106, 118), and Defendant's response in opposition, (ECF 112, 115).[1] On February 28, 2024, a hearing on the motion for class certification was held.[2] Following the class certification hearing (the "hearing"), the parties submitted additional post-hearing briefing. (ECF 158–61). The motion for class certification is now ripe for disposition. For the reasons set forth, the motion for class certification is denied.

---

[1] This Court has also considered Plaintiff's reply, (ECF 125, 127).

[2] The transcript of this hearing is cited throughout as "Hearing Tr."

**BACKGROUND**

The TCPA provides that "[i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement."  47 U.S.C. § 227(b)(1)(C).  Under the TCPA, an "unsolicited advertisement" is "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* at § 227(a)(5).

Here, Plaintiff asserts that Defendant violated the TCPA by faxing mass advertisements to Plaintiff and a class of purportedly more than 150,000 healthcare providers without obtaining prior express invitation or permission.  The facts relevant to the class certification are summarized as follows:[3]

> Plaintiff is a dental practice in Livonia, Michigan.  Defendant is a global provider of information, innovative technology solutions, and contract research services, previously known as IMS Health.
>
> As background, on August 12, 2010, SK&A Information Services ("SK&A")[4] entered into a license agreement with its client, ImpactRx, to use certain healthcare provider data for the following permitted use:
>
>> Direct marketing to the mailing addresses, telephone numbers, and fax numbers of recipients included in the Licensed Information an unlimited number of times during the SOW Term [a one-year duration beginning on August 12, 2010].
>
> (ECF 117-14, Ex. 38 at p. 2).  The licensed data included SK&A's database consisting of healthcare providers who had completed telephone surveys.  Each conducted survey call had the objective "to verify . . . information [including their name and fax number] and to reobtain permission from the healthcare professional

---

[3]   The facts are derived from the parties' statements of fact, briefs, the exhibits attached thereto, and the evidence presented at the hearing.

[4]   Neither party provides a description of what kind of company SK&A is.

for the inclusion . . . of their data in . . . Defendant's products."[5] (Escalante Dep., ECF 116-9, Ex. 10 at 57:16–25).

On April 1, 2015, Defendant acquired SK&A. During the summer of 2016, the companies "trade[d] assets," including SK&A's telephone verified database, "without a documentation trail." (*Id.* at 110:18–25; 115:21–126:06). Defendant licensed the data from SK&A "with the expectation" that it could be used to send faxes to the healthcare providers. (Snyder Dep., ECF 116-15, Ex. 17 at 125:13–19). Sometime in 2016, Defendant acquired ImpactRx, a client of SK&A.

When this action was filed in 2020, three of Defendant's datasets containing a portion of those healthcare providers' contact information existed and included approximately 9,824 fax numbers of various healthcare providers who "verified and gave permission to include their fax number" in the SK&A database. (Escalante Dep., ECF 116-9, Ex. 10 at 149:18–150:01); (Deal Rep., ECF 116-3, Ex. 4 at ¶ 30).

During the relevant time period (after May 19, 2016), Defendant administered a research study called the National Healthcare Census (the "NHC") to "measure the over-the-counter recommendations of healthcare professionals." (Cortright Dep., ECF 116-7, Ex. 8 at 20:08–12). To conduct the survey, Defendant engaged third-party Odyssey Services, Inc. ("Odyssey") to send faxes regarding the NHC study to healthcare professionals. The NHC faxes invited healthcare providers to register and complete the research study online. Defendant provided honorariums ranging from $15 to $150 to those healthcare providers who participated in the study. As part of the agreement between Odyssey and Defendant, Odyssey emailed Defendant documents referred to as "reports about the fax jobs" (the "Job Reports"), (Cortright Dep., ECF 116-7, Ex. 8 at 67:18–19), and its invoices for payment.

Sometime in September 2018, Odyssey suffered a ransomware attack that erased all of its records, including the records Odyssey had previously sent on Defendant's behalf during the purported class period. (Lokaisingh Dep., ECF 113-14, Ex. 14 at 56:08–20). Due to this ransomware attack, Odyssey was unable to produce any records in this case. Instead, Defendant produced the Job Reports which were located in email and network files of certain employees. (Cortright Dep., ECF 116-7, Ex. 8 at 71:03–05).

---

[5] In a "statement of work," SK&A provided, "Client acknowledges that IMS [SK&A] has not solicited or obtained the prior affirmative consent of any person whose information is included in the Licensed Information to receive communications whether of a commercial or non-commercial nature from or on behalf of Client." (Escalante Dep., ECF 118-8, Ex. 7 at p. 96). In 2016, SK&A's website warned that "SK&A does not obtain permission from healthcare sites or individual contacts to send communications to such fax numbers. SK&A's fax services are not offered to support unsolicited commercial advertisements." (ECF 106-10, Ex. I at p. 6).

Plaintiff claims that he received unsolicited faxes from Defendant regarding the NHC study on February 10, 2017, June 13, 2017, August 3, 2017, and August 8, 2017.

Based on these allegations, Plaintiff moves to certify the purported class defined as:

> All persons: (1) who were sent one or more facsimiles between September 29, 2016 and August 28, 2018, inviting them to participate in Impact Network's "National Healthcare Census" in exchange for monetary payment; (2) who did not participate in and had never participated in the "National Healthcare Census" survey; and (3) as to whom Defendant has not produced evidence showing SK&A verified the person's fax number.

(Pl's. Mot., ECF 118, at p. 20).

**LEGAL STANDARD**

Rule 23 governs the certification of class actions in federal court. A plaintiff seeking class certification must satisfy all requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465 (2013); *see also Marcus v. BMW of N. Am.*, 687 F.3d 583, 590 (3d Cir. 2012). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). A district court's analysis of a motion for class certification "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc.*, 568 U.S. at 465 (quoting *Dukes*, 564 U.S. at 351). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id.* at 466. "Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008).

4

> To satisfy the Rule 23(a) requirements:
>
> (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties' must be 'typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests of the class" (adequacy of representation, or simply adequacy).

*Marcus*, 687 F.3d at 590–91 (citations omitted).

If the plaintiff satisfies Rule 23(a), the plaintiff still must satisfy the "requirements of either Rule 23(b)(1), (2), or (3)." *Id.* at 590 (citing Fed. R. Civ. P. 23(a)–(b)). Here, Plaintiff seeks certification of the purported class pursuant to Rule 23(b)(3). This Rule permits certification when the court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The United States Court of Appeals for the Third Circuit (the "Third Circuit") has held that class ascertainability is "an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3)." *Marcus*, 687 F.3d at 592–93. As such, "[a] plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). The ascertainability requirement is a "threshold issue" and serves several objectives, including "insisting on the easy identification of class members" and "protect[ing] defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." *Marcus*, 687 F.3d at 593; *see also Stewart v. Beam Glob. Spirits & Wine, Inc.*, 2014 WL 2920806, at *14 (D.N.J. June 27, 2014). Thus, "[a]scertainability mandates a rigorous approach at the outset because of the key roles it plays as part of a Rule 23(b)(3) class action lawsuit." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307

(3d Cir. 2013). A "petition for class certification will founder if the only proof of class membership is the say-so of putative class members or if ascertaining the class requires extensive and individualized fact-finding." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356 (3d Cir. 2013). Therefore, a trial court should ensure that class members can be identified "without extensive and individualized fact-finding or 'mini-trials.'" *Marcus*, 687 F.3d at 593.

**DISCUSSION**

As noted, Plaintiff seeks class certification under Rule 23(b)(3). As such, this Court must first "undertake a rigorous analysis of the evidence to determine if the [ascertainability] standard is met." *Carrera*, 727 F.3d at 306.

I. *Ascertainability of Class Members*

"[A]s an essential prerequisite to class certification, [a] plaintiff must show by a preponderance of the evidence that the class is ascertainable." *Hayes*, 725 F.3d at 354 (internal quotation marks and citations omitted); *see also Byrd*, 784 F.3d at 165 (explaining that ascertainability "inquiry . . . is independent from the other requirements of Rule 23"). "Ascertainability functions as a necessary prerequisite (or implicit requirement) because it allows a trial court effectively to evaluate the explicit requirements of Rule 23. In other words, the independent ascertainability inquiry ensures that a proposed class will actually function as a class." *Byrd*, 784 F.3d at 162. "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.* at 163 (internal quotation marks and citations omitted).

*Plaintiff's Methodology for Ascertaining Class Membership is Unreliable*

To support its argument that the proposed class is ascertainable, Plaintiff relies on the opinions of Christopher Lee Howard ("Howard"), its proffered expert. Howard's opinions relied on his review of the Odyssey Job Reports. Specifically, Howard opined that the code delineated as "S" appearing in the Job Reports means successfully sent and, therefore, Defendant successfully transmitted 370,258 faxes to more than 134,223 different fax numbers. (Howard Rep., ECF 118-2, Ex. B at ¶¶ 29, 34). Relying on this opinion, Plaintiff seeks to ascertain class membership from the 134,223 fax numbers that were allegedly successfully sent one of Defendant's faxes.[6] However, this Court finds that Howard's opinions lack persuasion and credibility. In his report dated September 8, 2022, Howard explains that "[t]he reports for each of the thirty-two [Odyssey] fax broadcast jobs state in the 'Summary' sheet that a given number of fax transmissions were successfully sent to recipients listed in the 'Detail' sheet. For records on the 'Detail' sheet where a fax transmission was successful[,] an outcome code 'S' is given which is described on the 'Legend' sheet as meaning 'Sent.'" (*Id.* at ¶ 29). At the hearing, Howard testified that the records are reliable with respect to reporting successful transmission of the faxes because under the ITU-T.30 protocol utilized by fax machines, an MCF signal informs the sender that the transmission was successful. (Hearing Tr., at 33:24–34:21). In Howard's opinion, when a fax broadcaster

---

[6] To the extent that Plaintiff seeks to certify a class that includes those to whom Defendant sent faxes, but which were not received, such class fails because it would include class members who never suffered an injury. *See In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 192 (3d Cir. 2020) (vacating class certification where it appeared that "many [class members]—up to one-third of the entire class—"did not suffer injury). Plaintiff attempts to distinguish *In re Lamictal Direct Purchaser Antitrust Litigation* merely because that matter "was an antitrust class action in which the plaintiff was required to show that the class members suffered an 'antitrust injury' before class certification." (Pl.'s Reply, ECF 127, at p. 22). This argument is unpersuasive. In order to have a TCPA claim against Defendant here, members of Plaintiff's proposed class would have to have received an "unsolicited advertisement," *i.e.*, an advertisement without their consent, and thus, like that of *In re Lamictal Direct Purchaser Antitrust Litigation*, must have suffered an injury. *See Steven A. Conner DPM, P.C. v. Fox Rehab. Servs., P.C.*, 2022 WL 4080761, at *5 (E.D. Pa. Sept. 6, 2022) (explaining that under TCPA, it would have to be determined "whether class members were injured or [otherwise] provided consent" to receive defendant's faxes).

reports that a fax was sent, "it can *only* mean that it was sent successfully." (*Id.* at 41:02–06) (emphasis added). Therefore, under Howard's analysis, every fax number designated with code "S" on the Odyssey Job Reports successfully received Defendant's faxes.

However, Howard's other testimony at the hearing does not support that every fax number designated with code "S" on the Odyssey Job Reports successfully received Defendant's faxes. During the hearing, Howard also testified that the ITU-T.30 protocol, the "[f]ax communication protocol employed by all fax machines, fax servers, and other fax devices," (Howard Rep., ECF 118-2, Ex. B at ¶ 10), makes the Odyssey Job Reports "reliable because the receipt of [the] MCF signal by the sender, as sent from the receiver, tells the sender who's creating that log that it was successful indeed," (Hearing Tr., at 34:18–21). Yet, Howard later admitted that the ITU-T.30 protocol *does not* describe how "successful fax transmissions are recorded in logs" or how a summary report log is created. (*Id.* at 96:08–12). The 32 Odyssey Job Reports also do not define what "Sent" means: whether all five phases of the fax transmission (which Howard testified a fax must go through to successfully send) were successful such that the faxes were indeed successfully received. (*Id.* at 97:06–19). Howard also admitted "that computer-based fax systems may record a successfully sent fax using an outcome *other than* 'S' or 'sent.'" (*Id.* at 97:21–98:04) (emphasis added). Importantly, Howard testified that "false positive reporting" — where a log "indicates that a fax was successful but [] it was not" — can occur. (*Id.* at 100:18–21). As such, Howard's testimony creates serious doubts with respect to what the Odyssey Job Reports actually report and who the actual class members are.[7]

---

[7] In Plaintiff's response to Defendant's post-hearing brief, Plaintiff argues that this Court already rejected Defendant's argument that the Odyssey Job Reports are inaccurate and unreliable when it denied Defendant's motion to exclude certain of Howard's proffered opinions and held that "Plaintiff has proffered sufficient evidence at this stage of the proceedings, particularly, the testimony of Aaron Cortright, to

Plaintiff also falls short in establishing the reliability of the Job Reports. In *Steven A. Conner DPM, P.C. v. Fox Rehabilitation Services, P.C.*, the court there found the transmission logs unreliable with respect to receipt where the report plainly "notate[d] the 'status' of a fax transmission [as] "successful" when the president of the third-party communication service's declaration stated that the notation of "successful" on the log did "not guarantee that the transmission was actually successfully received." 2022 WL 4080761, *4 (E.D. Pa. Sept. 6, 2022). Here, unlike in *Steven A. Conner DPM, P.C.*, the Odyssey's Job Report logs ***do not*** plainly notate that the fax transmissions sent on Defendant's behalf were successful. Rather, as Howard gleaned from the legend and his own expertise, the logs merely indicate an "S," which, in his opinion, means the faxes were "Sent." (Howard Rep., ECF 118-2, Ex. B at ¶ 29). Similar to the president's declaration in *Steven A. Conner DPM, P.C.*, here, Odyssey's Chief Executive Officer, Ron Lokaisingh, testified in his deposition that due to the ransomware attack, he "would not be able to verify any of [the Job] Reports" issued prior to September 21, 2018, and would not "know whether or not those reports reliably reflect successful transmissions of faxes." (Lokaisingh Dep., ECF

---

authenticate the underlying reports." (*See* Pl's. Resp., ECF 161, at p. 3) (quoting ECF 137, at p. 3 n.1). Plaintiff, however, misunderstands the Court's Order.

In denying Defendant's motion to exclude certain opinions of Howard, this Court merely clarified the following: (1) experts can rely on inadmissible evidence and (2) Defendant's disagreement with the reliability of the underlying data went "to the weight of [] Howard's opinion ***rather than its admissibility***." (*Id.*) (emphasis added). ***Now***, tasked with the decision of whether to certify the class, this Court must evaluate the substance of the parties' differing expert opinions with respect to the Job Reports and determine which, if any, is credible and most persuasive. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 323 ("[O]pinion testimony should not be uncritically accepted as establishing a Rule 23 requirement because the court holds the testimony should not be excluded, under *Daubert* or for any other reason." (citation omitted)). "Weighing conflicting expert testimony at the certification stage is not only permissible; it [is] integral here." *Id.* (citing *Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005) ("[I]n ruling on class certification, a court may be required to resolve disputes concerning the factual setting of the case. This extends to the resolution of expert disputes concerning the import of evidence concerning the factual setting—such as economic evidence as to business operations or market transactions." (internal quotation marks omitted))). As such, this Court's previous determination that Howard's testimony would not be excluded does not hinder the Court from now deciding that his testimony is not persuasive.

9

113-14, Ex. 14 at 89:12–17). Thus, like the plaintiff in *Steven A. Conner DPM, P.C.*, Plaintiff here has not met its burden of demonstrating that the Odyssey Job Reports on which it relies to show that members of Plaintiff's proposed class successfully received Defendant's faxes are reliable.

Notwithstanding, Plaintiff relies on *City Select Auto Sales, Inc. v. David Randall Associates., Inc.*, 296 F.R.D. 299 (D.N.J. 2013) for the proposition that the class can be certified without reliable fax logs. Plaintiff's reliance is misplaced and does not save its proposed class. In the *David Randall Associates., Inc.* matter, the court explained that the particular transmission reports for the faxes were "sufficiently reliable that they [could] be used to identify those fax machines to which the advertisements were successfully sent as part of the fax campaigns" because the "[d]efendants [did] not adduce[] any evidence contradicting [the p]laintiff's expert's report and its explanation that 'successfully sent' means that the recipient's machine successfully received the fax." 296 F.R.D. at 309. However, those are not the facts in this case. Here, Defendant's expert James Bress ("Bress") opined that "it is ***not*** possible ***with any reasonable certainty*** to determine that any of the purported fax transmissions indicated in [the] Odyssey Job Reports were actually successfully transmitted." (Bress Rep., ECF 116-2, Ex. 3 at ¶ 56) (emphasis added). Bress further explained that there is "no evidence in the record to clarify what the transmission outcome (disposition) labeled as 'Sent' means in technical terms [and t]he Odyssey Job Reports do not explain what is meant by 'Sent' within the meaning of applicable telecommunication standards." (*Id.* at ¶ 51). During the hearing, Bress reiterated that, "[i]n [his] opinion, the Odyssey [J]ob [R]eports and any other evidence in this case do[] not indicate what[] 'S' or '[S]ent' means within those reports, whether it indicates a fax was successfully transmitted or received." (Hearing Tr., at 111:05–14). Instead, "Sent" could mean that "1) an end-to-end telephone connection was successfully made (Phase A), or 2) a successful fax call set-up handshake was completed (Phase

B). In either case, completion of Phase A or Phase B would not indicate that any fax page had been successfully transmitted." (Bress Rep., ECF 116-2, Ex. 3 at ¶ 53). Further, Howard could not point to any definition in the ITU-T.30 protocol or Odyssey's Job Reports which define the term "Sent" as meaning "successfully received."[8] (Hearing Tr., at 96:06–15, 97:06–19); *see supra* page 8.

Notably, the identification of the members in Plaintiff's purported class relies exclusively on Odyssey's Job Reports. Because these Job Reports do not reliably reflect whether the faxes were successfully sent, Plaintiff has failed to show that there is a "reliable . . . mechanism for determining whether putative class members fall within the class definition." *Byrd*, 784 F.3d at

---

[8] During the hearing, Howard testified as follows:

> Q: "You agree that T.30 says nothing about how successful fax transmissions are recorded?"
>
> A: "It describes how successful transmissions are determined, but **not how they're recorded in logs**."
>
> Q: "T.30 doesn't describe how a summary report log is created, does it?"
>
> A: "It does not."
>
> Q: "T.30 doesn't describe whether that log creation process is reliable, does it?
>
> A: "It does not."

(Hearing Tr., at 96:06–15) (emphasis added); (*see also* Def's. Post-Hearing Br., ECF 159, at p. 23) (quoting additional testimony wherein Howard testified that he lacked knowledge regarding Odyssey's quality control tests). Howard also testified:

> Q: "The Odyssey reports, the 32 reports you're relying on in this case, those reports nowhere define the word 'sent,' do they?"
>
> A: "It uses the word 'sent' but it doesn't in the legend—but *it doesn't then subsequently define what 'sent' means*."

(Hearing Tr., 97:06–11) (emphasis added).

163. As such, Plaintiff has not shown by a preponderance of evidence that the purported class is ascertainable.

### *Plaintiff's Methodology to Ascertain Class Membership is Not Administratively Feasible*

Plaintiff has also failed to establish an administratively feasible way of ascertaining the members of the class from the Job Reports. Plaintiff argues that the Odyssey Job Reports identify the name and fax number for each recipient of the NHC fax transmission. Plaintiff, however, glosses over the fact that two of the thirty-two Odyssey Job Reports ***do not*** include the targeted provider names but attempts to reassure the Court that "those names can be determined by reference to other detail reports." (Pl's. Reply, ECF 127, at p. 19 n.5); (Howard Rebuttal Rep., ECF, 118-6, Ex. F at ¶ 57). In its response, Defendant sheds light on the fact that Howard admitted in his deposition that these reports include 9,351 unique fax numbers in the proposed class "which do not have complete names associated with them in the Odyssey [Job R]eports." (Howard Dep. Tr., ECF 116-12, Ex. 13 at 89:16–18). Indeed, Howard confirmed in his deposition that "with respect to 8,599 unique fax numbers . . . , it's [his] conclusion that there is no personal identifying information in connection with those numbers" from Odyssey's Job Reports and he did not have an opinion on how to identify them.[9] (*Id.* at 90:08–13, 93:19–23). Therefore, even if the Odyssey Job Reports were reliable with respect to receipt, which this Court finds they are not, Plaintiff

---

9      In his rebuttal report, Howard writes that two of the Odyssey Job Reports "do not have names associated with fax numbers" but "other Odyssey Job Reports do have names associated with many if not all of those same fax numbers." (Howard Rebuttal Rep., ECF 106-7, at ¶ 57). This inconsistency with Howard's deposition testimony given under oath does not help Plaintiff. In its reply, Plaintiff reminds this Court that "[t]he proposed class is defined as 'persons,' not fax numbers" and there are "people who happened to use a fax machine with the same fax number as a class member." (Pl's. Reply, ECF 127, at p. 10). As such, according to Plaintiff, there may be people who used the same fax number as class members but are not class members. By proffering up fax numbers with missing identifying information and suggesting that those fax numbers were definitely used by the same person appears speculative at best without individualized inquiries and verification, which are inappropriate at this stage of litigation. *See Marcus*, 687 F.3d at 593 ("If class members are impossible to identify without ***extensive and individualized fact-finding or 'mini-trials,'*** then a class action is inappropriate." (emphasis added)).

would have to contact over eight thousand fax numbers to identify and verify the remaining class members.

Putting aside those more than eight thousand fax numbers that have no identifying information, Plaintiff contends that the Odyssey Job Reports match Defendant's contact lists and that it is possible to (1) ascertain objectively which fax recipients participated in the NHC survey and (2) identify who went through the SK&A verification process. This Court disagrees. As discussed above, Plaintiff fails to provide an administratively feasible mechanism to determine whether the fax sent to each healthcare provider was successful without conducting individual inquiries. Howard's testimony that "S" means "successfully transmitted" is unpersuasive when considered in light of Defendant's expert Bress' testimony, noted above, that "the Odyssey [J]ob [R]eports and any other evidence in this case do[] not indicate what[] 'S' or 'sent' means within those reports, whether it indicates a fax was successfully transmitted or received." (Hearing Tr., at 111:05–14). As noted and explained by Bress, "S" could "mean the initial phase, phase A, when the call was connected was successful; it could mean [p]hase B, the handshake that occurs after that. But it doesn't necessarily mean that a fax went all the way throughout the process and actually was transmitted and received." (*Id.*). Plaintiff has not convincingly or substantially rebutted these opinions. As such, this Court finds that Plaintiff has failed to present a reliable mechanism to determine which healthcare providers actually received Defendant's faxes in a manner "that does not require much, if any, individual fact inquiry." *See Carrera*, 727 F.3d at 307–08.

Even if there was a mechanism to determine whether Defendant successfully sent each healthcare provider faxes and did not participate in the NHC survey, Plaintiff fails to establish a feasible mechanism to identify those recipients who did not consent to receive the faxes such that they suffered an injury. As Defendant asserts, when the SK&A database was integrated with

13

Defendant's data in 2016, it occurred without a paper trail. (*See* Escalante Dep., ECF 116-9, Ex. 10 at 110:18–25). As Defendant's expert Bruce Deal ("Deal") opines, given the small subsets of data available and the actual size of SK&A's database, which is 25 times larger than the subsets, it is conceivable that many healthcare providers went through the SK&A verification process. (Deal Rep., ECF 116-3, Ex. 4 at ¶¶ 34–36). Additionally, Plaintiff does not point to any affirmative evidence which shows that the remaining healthcare providers did not otherwise consent to receiving Defendant's faxes. (*See id.* at ¶ 31). Therefore, as Deal convincingly opines, "individualized inquiries are necessary to determine which [healthcare providers] consented to receive faxes." (*Id.* at p. 16). Both Bress and Deal's opinions credibly underscore that Plaintiff's method is infeasible and would require contacting thousands of fax numbers to determine whether (1) those individuals received one of Defendant's fax(es) and (2) if they did, whether they consented to receive the fax(es). At this stage, this Court finds that Plaintiff has "not satisf[ied] the ascertainability requirement [because] individualized fact-finding or mini-trials [would] be required to prove class membership." *Carrera*, 727 F.3d at 307.[10]

---

[10] This Court recognizes that predominance was heavily discussed by the parties at the hearing as another basis for denial of Plaintiff's motion. Because Plaintiff has failed to satisfy the threshold requirement of ascertainability, this Court need not and declines to address whether Plaintiff's proposed class meets the Rule 23(a) or 23(b) requirements. *See Jarzyna v. Home Props., L.P.*, 321 F.R.D. 237, 244 (E.D. Pa. 2017) ("Given that [p]laintiff cannot meet the threshold requirement for class certification by showing that his proposed class is ascertainable, . . . the [c]ourt need not proceed to analyze other class certification requirement under Rule 23 . . . ."); *Stewart*, 2014 WL 2920806, at *14 (explaining that even though defendants "challenge[d] [p]laintiffs' ability to satisfy . . . requirements of Rule 23(a)" as well as predominance and superiority under Rule 23(b), the court "need not address these issues at this time in light of its finding that the proposed [c]lasses [were] not ascertainable, given that ascertainability of the class is a threshold issue the [c]ourt must address before moving to the requirements of Rule 23(a) and 23(b)(3)"); *see also Hayes*, 725 F.3d at 359 (declining to "reach the question of whether [plaintiff] could satisfy Rule 23(b)(3) predominance" after court found he failed to satisfy ascertainability).

**CONCLUSION**

For the reasons set forth and based on the evidence presented at the class certification hearing and in the parties' filings, this Court finds that Plaintiff has failed to satisfy the ascertainability requirement because the Job Reports on which Plaintiff relies to identify class members are demonstrably unreliable. Further, the method Plaintiff sets forth to identify class members is inadequate since it requires a highly individualized inquiry which is not permitted. *See Carrera*, 727 F.3d at 307. As such, this Court finds that class ascertainability, an essential prerequisite for class certification with respect to actions under Rule 23(b)(3), has not been met and, thus, certification of Plaintiff's proposed class is improper. Accordingly, Plaintiff's motion for class certification is denied. An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.